IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:10cr039 |
| | ) | |
| | ) | JUDGE HAYNES |
| DVONNE K. HOWARD | ) | |

## MEMORANDUM

The United States of America filed this criminal action against defendant Dvonne K. Howard charging him with being a felon in possession of a firearm.

Before the Court is Defendant's motion to suppress his statements from July 24, 2009 (Docket Entry No. 16), to which the Government has responded (Docket Entry No. 18). The Court held a suppression hearing on June 1, 2010. For the following reasons, Defendant's motion should be denied.

### A. ANALYSIS OF THE EVIDENCE

Between 12:00 a.m. and 1:00 a.m. on the morning of July 24, 2009, officers from the Metropolitan Nashville Police Department (MNPD) responded to shots fired call at 913 William Edmonson in Nashville. MNPD Detective Darryl Howard and MNPD Officer Michael Buchanan arrived and found Defendant lying in the doorway with a gunshot wound to his left leg. The Defendant was in pain and required medical attention. The officers asked Defendant who shot him and sought information about the shooter. The officers considered Defendant a victim and did not provide Miranda[1] warnings. Within a few minutes of the officers' arrival, an ambulance arrived and transported Defendant to Vanderbilt Hospital. The officers did not ride in the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

1

ambulance with Defendant. Officer Buchanan also interviewed witnesses. A firearm and shell casings were recovered from the residence.

MNPD Detective Jill Weaver arrived at the residence after Defendant had departed. Detective Weaver spoke to Eugenia Gooch, Defendant's girlfriend who lived at the residence. Gooch stated that Defendant called her to say he was coming over. Gooch heard gunshots and found Defendant lying by the doorway. According to Gooch, Defendant instructed her to call the police. Defendant had a firearm, which Gooch took and placed in the trash behind the apartment. The firearm was recovered from the garbage bin. Detective Weaver also spoke to other witnesses.

Detective Weaver departed the residence and went to Vanderbilt Hospital to ask Defendant why he was shot and who did it. Detective Weaver was unaware that Defendant had been previously convicted of a felony. Detective Weaver did not advise Defendant of his Miranda rights because she considered him a victim. Defendant was awake and alert and able to move and talk. Detective Weaver interviewed Defendant in his hospital room for approximately twenty-five to thirty minutes. The door was open. Detective Weaver was the only officer in the room, but an officer was outside the room. Medical personnel entered and departed the room during the interview. Detective Weaver asked Defendant what had happened that led to him being shot and firing back. Defendant told Detective Weaver that he was robbed before at that location and they were trying to rob him again. Detective Weaver asked if he had a gun. Defendant stated in substance that he had a gun for protection and that he had dealt drugs in the past. Defendant did not ask to terminate the interview.[2]

Officer Buchanan went to Vanderbilt Hospital to interview the Defendant around 1:30

---

[2] After leaving Vanderbilt Hospital, Detective Weaver went to another hospital to interview the suspected shooter. Detective Weaver took out a warrant on the suspect, but charges were ultimately dropped.

a.m. the same day. Officer Buchanan was unaware that Defendant had previously been convicted of a felony. The interview took place in the Vanderbilt emergency room and lasted approximately five minutes. Defendant was in pain, but was alert and appeared oriented to time and place. Defendant was hooked up to medical machines. Officer Buchanan did not inquire about Defendant's medical status or medications. Officer Buchanan was the only officer present during the interview, but medical personnel may have entered the room. Officer Buchanan advised Defendant of his <u>Miranda</u> rights using a Gun Arrest Questionnaire. Defendant acknowledged that he understood his rights, but refused to sign the rights waiver form. Officer Buchanan asked Defendant if the gun were his. Defendant responded that the gun was his and he had it for protection. Defendant did not answer some of the questions Officer Buchanan asked him. Defendant did not ask to terminate the interview.

The Gun Arrest Questionnaire and Howard's supplemental report were submitted as exhibits to the suppression hearing. Howard's report states that "Once the fire department arrived and began moving the victim, he was in to[o] much pain to answer anymore questions I asked him."

### B. CONCLUSIONS OF LAW

Under the Fifth Amendment to the United States Constitution, a defendant in a criminal case cannot be compelled to be a witness against himself. Consistent with that right, the Supreme Court held in <u>Miranda v. Arizona</u> that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." 384 U.S. 436, 467-68 (1966). The Sixth Circuit explained that "[t]he <u>Miranda</u> rule's application is limited to 'custodial interrogations,' which the Supreme Court has defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in a significant way.'" United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1988)(quoting Oregon v. Mathiason, 429 U.S. 492, 494 (1977)). Not all police questioning constitutes custodial interrogation. As the Supreme Court in Miranda explained:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement . . . [.]

384 U.S. at 477-78 (citation omitted).

In a word, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Mathiason, 492 U.S. at 495). Yet, when a defendant's freedom of movement is limited by a factor independent of law enforcement conduct, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436 (1991). As the Supreme Court explained in Bostick, where the defendant's freedom of movement was restricted by the factor independent of police conduct of being a passenger on a bus:

> [T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Where the encounter takes place is one factor, but it is not the only one . . . [.]

Id. at 437 (citations omitted).

When there is custodial interrogation, a defendant must be informed of his or her constitutional right to remain silent and to consult with an attorney and can waive those rights provided the waiver is made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 444.

4

"[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, 'including the background, experience, and conduct of the accused.'" Machacek v. Hofbauer, 213 F.3d 947, 954 (6th Cir. 2000) (citation omitted).

Here, Defendant argues that his statements to Detectives Howard and Weaver and Officer Buchanan should be suppressed because he did not receive Miranda warnings at the crime scene and Defendant was "in no condition to give a voluntary, knowing, and intelligent wavier of Miranda rights." (Docket Entry No. 16, at 3). Defendant also argues that the "putative waiver of his Miranda rights is invalid because it was made on the heels of the unlawful interrogation at the crime scene," citing Missouri v. Seibert, 542 U.S. 600 (2004) (dealing with delayed Miranda warnings). Id. at 4. The Government responds that Defendant was not in custody at the crime scene or the hospital and Officer Buchanan obtained a valid Miranda waiver from Defendant. (Docket Entry No. 18).

The Miranda issue here was addressed in a similar factual context in United States v. Jamison, 509 F.3d 623, 625-26 (4th Cir. 2007). There, the defendant arrived at the hospital with a gunshot wound and called out to nearby officers that he had been shot. An officer followed defendant to his hospital room and interviewed him for approximately twenty minutes about the shooting. Id. at 626-27. Without defendant's consent, the officer also examined defendant's injury and there were paper bags placed on defendant's hands to test for gunshot-residue. Id. A crime-lab technician was in defendant's room for approximately forty minutes taking photographs and collecting evidence. The Fourth Circuit held the defendant was not in custody

during the interview at the hospital, stating in pertinent part:

> In dissecting the perceptions of such a reasonable person, however, we must be careful to separate the restrictions on his freedom arising from police interrogation and those incident to his background circumstances. That is, to the extent Jamison felt constrained by his injuries, the medical exigencies they created (e.g., the donning of a hospital gown and the insertion of an I.V. line), or the routine police investigation they initiated, such limitations on his freedom should not factor into our reasonable-person analysis. It is this careful differentiation between police-imposed restraint and circumstantial restraint that leads us to conclude that Jamison was not in custody when he described the shooting during his hospital interview . . .
>
> \* \* \*
>
> . . . Granted, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). But Miranda and its progeny do not equate police investigation of criminal acts with police coercion. This distinction is especially salient when the victim or suspect initiates the encounter with the police. Cf. United States v. Kimbrough, 477 F.3d 144, 146-47 (4th Cir. 2007) (holding that questioning by the defendant's mother was not initiated by law enforcement officers and therefore the defendant was not in custody during the questioning).
>
> . . . Before any officer had an opportunity to question Jamison, he called out for their assistance . . . Having invoked the protective and investigatory powers of the police, a reasonable person in Jamison's position would not then be surprised when asked to recount a description of the shooting. Given the violent nature of the crime and the fact that Jamison's very injuries and explanations constituted key evidence, a reasonable person would expect to be interviewed even while receiving urgent medical care. Indeed, a reasonable person might complain of police malfeasance had they *not* immediately investigated the shooting. In the context of this investigation, even the most significant limitation on Jamison's freedom, the bagging of his hands, seems less intrusive. A reasonable person would not feel deprived of his freedom by the neutral application of such a blanket policy to victims and suspects.
>
> As Jamison's questioning progressed and his accounts began to reveal inconsistencies, a reasonable person would expect diligent investigators to ask for clarification. Furthermore, a reasonable person would not be surprised to have the police investigate and even photograph the gunshot wound . . .[ .]
>
> \* \* \*

**Jamison was primarily restrained not by the might of the police, but by his self-inflicted gunshot wound, the medical exigencies it created, and the investigation he initiated. We therefore conclude that a reasonable person in Jamison's circumstances would not have found himself restrained by the police... We therefore hold that Jamison was not in custody at the time he offered the statements describing the shooting, including his admission that he shot himself.**

\* \* \*

> FN10. The government notes that the other courts that have considered police interviews in a hospital setting have reached a similar result. See United States v. Robertson, 19 F.3d 1318, 1320-21 (10th Cir.1994) (finding defendant was not in custody even though he was interviewed by law enforcement while he was hospitalized with a head injury); United States v. Martin, 781 F.2d 671, 674 (9th Cir.1986) (finding that a defendant, groggy from the effects of Demerol, who spoke with detectives in his hospital room was not in custody and therefore not entitled to Miranda warnings); State v. Middleton, 854 S.W.2d 504, 516 (Mo.Ct.App.1993) (finding that a shooting suspect was not in custody during police questioning at his home in part because the officers' paraffin test of the defendant's hands, designed to detect gunshot residue, was part of routine police investigation into the shooting). We find the reasoning in these cases serves only to confirm our own.

\* \* \*

> ... The fact of Jamison's injury, the trappings of his treatment, and the routine aspects of the investigation he initiated provided the most substantial restrictions of Jamison's freedom of movement, far outstripping whatever additional impingement on his freedom to leave was presented by the officers during the ongoing police investigation into his shooting.

### III.

**Absent police-imposed restraint, there is no custody. It was Jamison, not the police, who initiated the questioning at issue here when he told police at the hospital that he was the shooting victim of an unknown assailant. The police posed questions to Jamison and restricted his freedom of action, but only to the degree necessary to investigate the crime. Their activities did not transform Jamison's hospital interview into a custodial interrogation. As Jamison's statements were not made under custodial interrogation, Miranda warnings were not required, and the statements should not have been suppressed ...[.]**

Id. at 629, 631-33 (citations and footnotes omitted, emphasis added). See also United States v. New, 491 F.3d 369, 373-74 (8th Cir. 2007) (defendant who during interview was "in a private hospital room, confined to his bed in a neck brace and under medication" was not in custody and his confession was voluntary).

Here, the uncontested testimony is that Defendant instructed Gooch to contact the police. Thus, Defendant initiated the contact with the officers. At the crime scene, the officers asked Defendant general on-the-scene questioning about the shooting. Defendant departed by ambulance a short time after the officers arrived. When Detective Weaver and Officer Buchanan interviewed Defendant at the hospital, he was confined to a hospital room and receiving treatment. However, Defendant's freedom of movement was primarily restricted by his gunshot wound, the medical exigencies it created, and the investigation he initiated, and not by actions of law enforcement. The interviews by Detective Weaver and Officer Buchanan were short in duration, approximately twenty-five to thirty minutes and five minutes, respectively. Medical personnel were permitted to enter the room and only one officer was present in the room during the interviews. Defendant told Officer Buchanan that he understood his Miranda rights and he chose not to answer certain questions. Taking account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was free to terminate the interviews. Thus, the Court concludes that Defendant was not in custody on July 24, 2009 and Miranda warnings were not required.

"A confession is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" New, 491 F.3d at 374 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). Defendant has not alleged and there was no proof at the suppression hearing of coercive police conduct, which is a "necessary predicate to the finding that a confession is not

voluntary." Connelly, 479 U.S. at 167. Moreover, the uncontested proof at the suppression hearing was that even though he was in pain, Defendant was alert, appeared oriented to time and place, and was able to move and respond appropriately to the officers' questions at the hospital and until medical professionals arrived at the crime scene. As Miranda warnings were not required, the Court need not reach the Defendant's alternate argument that his putative Miranda waiver was invalid.

## C. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (Docket Entry No. 16) should be denied.

An appropriate Order is filed herewith.

Entered on this the ___22nd___ day of November, 2010.

                                                WILLIAM J. HAYNES, JR.
                                                United States District Judge